UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

————————————————————

)
SMITH MARINE, INC.,                                    )
                                                                       )
            Plaintiff,                                         )
                                                                       )
v.                                                                     )            Civil No. 11-11537-LTS
                                                                       )
KYLE CONTI CONSTRUCTION, LLC,        )
                                                                       )
            Defendant.                                     )
————————————————————)

MEMORANDUM AND ORDER ON PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

July 15, 2013

SOROKIN, C.M.J.

The plaintiff, Smith Marine, Inc. ("SMI"), provided barges and other work boats to the defendant, Kyle Conti Construction, LLC ("KCC"), in connection with a bridge remediation project on the Delaware River.  In this action, SMI claims KCC breached its contract with SMI by failing to pay monies due thereunder.  KCC has counterclaimed, alleging SMI's failure to perform as required and in good faith delayed the project and entitles KCC to certain "back charges."  SMI has moved for summary judgment and, for the reasons that follow, its motion is ALLOWED.

I.        BACKGROUND

Many of the facts identified by the parties in their lengthy statements of material fact are not material to the resolution of SMI's motion, which largely turns on the undisputed language of the contract at issue.  The Court will recount only those facts which are necessary to its summary judgment determination.

A.      The Project and the Time Charter

KCC, a New Jersey construction company, was awarded a contract by the Delaware

River Joint Toll Bridge Commission ("the Commission") to perform repairs on five bridges

spanning the Delaware River between Pennsylvania and New Jersey.  Doc. No. 36 at ¶¶ 1, 3;

Doc. No. 44 at ¶ 1.  Trumbull Corporation ("Trumbull") managed the project on behalf of the

Commission.  Doc. No. 36 at ¶ 2.  Three of the five bridges required "scour remediation," a

process which involved reinforcing and protecting from erosion the portions of the bridges' piers

that are submerged in the water.  Doc. No. 36 at ¶ 6; Doc. No. 44 at ¶ 11.  In order to perform

such work, KCC needed barges and support vessels to transport people and materials (such as

large sandbags) between the shoreline and the piers, and to provide work platforms on the water.

Doc. No. 36 at ¶ 8; see Doc. No. 44 at ¶ 12; cf. Doc. No. 46 at ¶ 8.

KCC's equipment manager identified SMI as a potential supplier of barges and work

boats.  Doc. No. 32 at 5-7;[1] Doc. No. 36 at ¶ 9.  In early September 2010, SMI provided KCC

with information about its barges, including the need for a water depth of at least two feet to

operate the barges while loaded with standard SMI equipment.  Doc. No. 36 at ¶ 10; Doc. No.

31-1 at 2-4, 6-9.  A few weeks later, SMI sent KCC a contract entitled "Time Charter Party,"

with associated "Time Charter Party Terms," pursuant to which SMI would provide KCC with a

barge equipped with an articulating lift and a knuckleboom crane, as well as a work boat and

vessel operators.  Doc. No. 36 at ¶ 14; Doc. No. 31-1 at 11-16.  KCC's senior project manager,

Reginald Elsman, was responsible for negotiating terms and signing the contract.  Doc. No. 28-1;

---

[1]In citations to documents by ECF docket number, the page numbers used are those
printed in the ECF page headers.

Doc. No. 44 at ¶ 19; Doc. No. 54 at 12-14; see Doc. No. 52 at 18 (KCC's president, Kyle Conti, was not involved in hiring SMI); Doc. No. 53 at 19 (superintendent Frank McQuaid was not involved in discussing or reviewing terms of the contracts).

The Time Charter Party ("the Charter"), which Elsman executed on September 28, 2010, contained the following relevant provisions:

> 5.  ***The entire operation, navigation, and management of the Vessel shall be in the exclusive control and command of [SMI], [its] Master, Officers and Crew***.  The Vessel will be operated and the services hereunder will be rendered as requested by [KCC], ***subject always to the exclusive right of [SMI] or the Master of the Vessel to determine whether operation of the Vessel may be safely undertaken***.

Doc. No. 28-1 at 2 (emphasis added).

> 8(e).  Payments – Payments . . . shall be received within [thirty] days . . . from the date of receipt of the invoice.  If payment is not received by [SMI] within 10 banking days following due date, [SMI] shall have the right to withdraw the Vessel [or] . . . to suspend the performance of any and all of [its] obligations hereunder . . . .  If payment is not received by [SMI] within 10 banking days following due date, [SMI is] entitled to charge interest at the rate [of 18% annually] on the amount outstanding from and including the due date until payment is received.  [KCC] agrees to pay any and all legal fees and costs incurred in securing or collecting any amount owed hereunder.

Id. at 3.

> 18.  This Charter Party shall be governed by and construed in accordance with the General Maritime Law of the United States, and to the extent not applicable, the laws of the Commonwealth of Massachusetts . . . .

Id. at 4.

The Charter restricted the vessels' area of operation to "any place where the Vessel[s] can safely lie always afloat."  Id. at 2.  It defined the services involved as: "Crane barge, equipped with lift used as marine access to assist in bridge rehabilitation operations.  Vessel operator included."  Id. at 7.  The "period of hire" was an estimated two months, but would

3

extend to include "[d]ays necessary to complete bridge rehabilitation operation."  Id.  After

setting out daily charges that decreased as the number of working days increased, the Charter

included a $450-per-day "Standby/Lay Day Charge," to be imposed as follows:

> **If for reasons beyond [SMI's] control, i.e. wind, ice, weather, we cannot work, a lay day fee will be incurred**.  Lay day fee will also be incurred if barge is held or reserved by client for storing client's equipment or materials[].  Operator is not included on standby/lay days. [SMI] is not responsible for ice breaking services, should they apply.  **A lay day will be charged for day(s) the equipment is unable to operate due to river freezing**.

Id. (emphasis added).

The day KCC executed the Charter, McQuaid met SMI's vice president of operations at

the job site in New Jersey to inspect the work area.  Doc. No. 36 at ¶ 20; Doc. No. 44 at ¶ 17.

The next day, SMI assembled its barge on site (it had been transported there by truck, in pieces).

Doc. No. 36 at ¶ 21; Doc. No. 44 at ¶ 20.

> **B.**     Late September through Late December

The barge was moored at a staging area on Thursday, September 30, 2010 due to heavy

rains that continued through the following morning.  Doc. No. 36 at ¶¶ 22-23.  The rains caused

the river to flood, and the barge was swept more than a mile downstream, where it later was

located and recovered ("the October 1st incident").  Doc. No. 36 at 25; see Doc. No. 29 at ¶ 15.

As a result of the October 1st incident, SMI instituted strict protocols for monitoring the river

depth using nearby gauges maintained by the United States Geological Survey ("USGS") and

documented on the National Oceanic and Atmospheric Administration website, and requiring

twenty-four-hour supervision of the vessels when the river rose to "action stage."[2]  Doc. No. 36

---

[2]Elsman shared a copy of these "immediately established" protocols with Trumbull and described the October 1st incident as one "in which high waters and rapid waters caused the

at ¶¶ 26-29; Doc. No. 44 at ¶¶ 25-26.

SMI put the barge back in service on October 8, 2010.[3]  Doc. No. 62 at ¶ 23.  During the week of standby time, KCC executed an amendment to the Charter's terms.  Doc. No. 28-1 at 9. The amendment made the following changes: it added a second barge (which SMI secured from a company in Maryland), three additional work boats, and additional vessel operators; it altered the applicable rate schedule to reflect longer shifts and to eliminate changes in daily rates over time; it amended the lay day rate to $450 per barge, per shift (rather than per day); and it changed billing from monthly to biweekly, with payments required within fifteen days instead of thirty.  Compare id., with id. at 7.

The second barge arrived at the job site on October 12, 2010.  Doc. No. 36 at ¶ 38.  Work continued until November 2, 2010, with the exception of one day when a storm was expected, and certain weekend days when KCC placed the barges on standby.  Doc. No. 36 at ¶ 39; Doc. No. 44 at ¶ 27; see Doc. No. 30-1 at 7-9; Doc. No. 31, Ex. 41 at 1-2.[4]  From November 2 through 9, 2010, SMI placed its barges on standby due to its determination that water levels were too low to operate them.[5]  Doc. No. 44 at ¶ 27; see Doc. No. 31-1 at 9.  The barges were back in service

---

barge to break loose from its mooring."  Doc. No. 57 at 1-2.  He also noted that, going forward, both SMI and KCC would check USGS water gauge information daily.  Id. at 1.

[3]The parties disagree about the reason for this one-week delay: SMI claims it was due to high water levels following the heavy rains, Doc. No. 62 at ¶ 23; KCC asserts it was due to the October 1st incident, which it contends resulted from negligent mooring of the barge by SMI, Doc. No. 44 at ¶¶ 22-23.  This dispute is immaterial for purposes of SMI's motion.

[4]Exhibits 41 through 49 to Robin Smith's affidavit were manually filed and served on KCC's counsel.  They do not appear on the electronic docket, but are retained as part of the Court's file.

[5]KCC agrees SMI made this determination, but disputes the reasonableness of it and other determinations like it made in the following months.  Those disputes will be addressed

on November 10, 2010.  Doc. No. 44 at ¶ 27.  That day, SMI's push boats struck rocks and

required propeller repairs.  See Doc. No. 36 at ¶ 46; Doc. No. 44 at ¶ 29.  Nonetheless, the

barges remained in service and work continued until KCC placed the barges on standby from

November 18 through 28, 2010.  Doc. No. 36 at ¶¶ 47, 50.  During that time, KCC made the first

of two requests to Trumbull that the project deadline be extended.  Doc. No. 36 at ¶¶ 49, 77.

The barges were moved on November 29, 2010 to begin work at a different bridge.  Id. at

¶ 50.  On November 30th, after both barges were loaded with equipment and materials, SMI

determined it could not safely navigate them over a sandbar between the shore and the pier

where work was occurring.  Doc. No. 36 at ¶¶ 54-55; see Doc. No. 30-1 at 11.  Thereafter, SMI

secured the barges due to rain and concern for rising water levels.  Doc. No. 36 at ¶¶ 55-56.  The

barges were reassembled and loaded on December 6, 2010, when SMI determined the water

levels had decreased sufficiently.  Id. at ¶ 57; Doc. No. 44 at ¶ 31.  Work continued through

December 23, 2010, except for one Sunday when KCC did not work and one other day when

SMI determined water levels were dangerously high.  Doc. No. 36 at ¶ 58; Doc. No. 44 at ¶ 31.

C.     Late December through February

Due to the holidays, KCC placed the barges on standby from December 24 through 26,

and a snow storm prevented work on December 27, 2010.  Doc. No. 36 at ¶¶ 59-60.  Work

briefly resumed on December 28, 2010, as one barge loaded with equipment was moved into

place near a pier, but SMI suspended operations later that day after determining water levels had

dropped too low to maneuver the second barge past a shallow area created by a rocky shoal

between the shore and the pier.  Doc. No. 36 at ¶¶ 61-62, 70-71; Doc. No. 44 at ¶¶ 32, 36.  The

───────────────

below.

barges remained on standby until January 21, 2011 based on SMI's assessment that there was insufficient water depth to operate them.  Doc. No. 44 at ¶ 32.  In the meantime, KCC informed Trumbull that the barges could not be moved, Doc. No. 36 at ¶ 62, and SMI's work boats sometimes were used for work on other bridges and to conduct assessments of the water levels in the areas around the barges, id. at ¶¶ 66, 68.  Additionally, KCC rented land-based equipment from other companies as alternative means of performing some of the required bridge work.  See Doc. No. 31, Ex. 41 at 3.

For a January 14, 2011 meeting between KCC and Trumbull, Elsman used information from SMI regarding the weights of the barges, along with data he collected on his own from the USGS gauge system regarding river depths, to assess the feasibility of moving the barges during two weeks in early January.  Doc. No. 36 at ¶¶ 72-74; Doc. No. 44 at ¶ 35.  Elsman's analysis confirmed that the water levels during the period he studied were insufficient for the barges, as they were loaded and configured, to operate.  Doc. No. 36 at ¶ 73; Doc. No. 54 at 27, 30.  On January 19, 2011, KCC claimed in a letter to Trumbull that the contract specifications regarding use of barges had not accounted for the physical characteristics of the river or changing weather conditions.  Doc. No. 36 at ¶ 76.  The next day, Elsman requested a further extension of the project completion date.  Id. at ¶ 77.

On January 21, 2011, SMI's president, Andrew Smith, traveled to the work site to assist with an attempt to move one of the barges to deeper water ("the January 21st maneuver").  Doc. No. 30 at ¶ 50; see Doc. No. 53 at 35.  The parties disagree about the method used to move the barge, but they agree that the bottom of the barge touched the riverbed during the maneuver.

Doc. No. 36 at ¶ 79; Doc. No. 53 at 53-54, 59.[6]  The same day, at KCC's request, SMI's senior

vice president and project manager drafted a letter to Trumbull explaining why the January 21st

maneuver had not been attempted previously.  Doc. No. 44 at ¶ 42.  Although the letter called the

maneuver a "success[]," it noted the barge and two work boats had hit the bottom of the river

during the move.  Doc. No. 31-2 at 72.  Elsman reviewed and approved the content of the letter.

Doc. No. 29-1 at 8-9; Doc. No. 54 at 20.

The barges were in service on January 22, 2010, KCC placed them on standby the

following day, and work resumed on January 24th.  Doc. No. 36 at ¶¶ 81-82.  That night,

however, the river froze and the barges became stuck in ice.  Id. at ¶ 83.  SMI determined work

was unsafe and would remain so until the barges broke free of the ice, which occurred on

February 8, 2011.  Id. at ¶¶ 84-85.  When work resumed, KCC used SMI's barges on the project

for approximately twenty more days,[7] see Doc. No. 31, Ex. 41 at 4-5, and SMI procured smaller

floats to use during any further low-water periods, Doc. No. 44 at ¶ 48.

---

[6]This fact is supported by McQuaid's deposition testimony about events which he
witnessed.  In its responses to SMI's statement of material facts, KCC claims McQuaid's
testimony establishes only that the barge struck the bottom of the river "at some unspecified time
during the project," Doc. No. 46 at ¶ 79, a position KCC reiterated at the recent hearing on
SMI's motion.  However, the deposition transcripts show that McQuaid twice agreed the barge
touched bottom, both times in response to series of questions specifically referencing the January
21st relocation of the barge.  Doc. No. 53 at 53-54, 59.  McQuaid did not seek to alter or qualify
that testimony in his affidavit.  Doc. No. 48.  Nevertheless, even assuming McQuaid never
testified the barge struck bottom on January 21st, there is nothing in the record from him (or any
other witness) denying that the barge touched the riverbed during that maneuver.  In fact, the
only other evidence on this point is an affidavit from Andrew Smith, who actually moved the
barge on January 21st and stated it did touch bottom.  Doc. No. 30 at ¶ 51.  KCC has offered
nothing to dispute Smith's statement beyond counsel's questionable interpretation of McQuaid's
deposition testimony; thus, Smith's description of the January 21st maneuver is uncontroverted.

[7]This contradicts KCC's claim that, as of December 28, 2010, the barges were only
needed for a few more days.  See Doc. No. 44 at ¶ 45.

D.    SMI's Invoices and KCC's Payments

At the outset, KCC provided nearly immediate payment.  SMI sent Elsman an initial

invoice for mobilization of the barges on September 23, 2010, and KCC wired full payment five

days later.  Doc. No. 31-2 at 7-10; Doc. No. 36 at ¶ 87.  When the Charter was amended to

include additional vessels, KCC paid the new mobilization invoice the same day SMI sent it.

Doc. No. 36 at ¶ 88; see Doc. No. 31-2 at 12-14 (invoice emailed, and payment wired, on

October 7, 2010).  Thereafter, however, KCC paid SMI beyond the amended Charter's fifteen-

day deadline, see Doc. No. 28-1 at 9, and failed to pay certain invoices altogether.[8]

The following invoices were paid late, were paid only in part, or never were paid at all:

•      The October 25, 2010 invoice for $72,912 (covering September 30 to October 17, 2010)

       was paid on November 19, 2010, only after SMI inquired about the status of the payment.

       Doc. No. 31-2 at 16-20, 27; Doc. No. 36 at ¶¶ 89, 91, 93.

•      The November 4, 2010 invoice for $77,386.39 (covering October 18 to 31, 2010) was

       paid on December 14, 2010, after SMI twice asked KCC about the status of the payment.

       Doc. No. 31-2 at 22-25, 27, 46, 51; Doc. No. 36 at ¶¶ 90-91, 96.

•      The November 18, 2010 invoice for $52,536 (covering November 1 to 14, 2010) was

       paid on February 10, 2011, after SMI inquired four times about the status of the

       payment.[9]  Doc. No. 31-2 at 33-39, 46, 62-63, 74-75, 77; Doc. No. 36 at ¶¶ 92, 102.

_____

[8]KCC raised no objections to the invoices at the time they were received.  See, e.g., Doc.
No. 31-2 at 28-29, 80-82; Doc. No. 31-3 at 12-13, 18; cf. Doc. No. 31-3 at 20 (reflecting that in
late April 2011 McQuaid raised a concern about "lay day/standby time" charged in January).

[9]Despite having paid this invoice without objection, KCC now asserts SMI was not
entitled to any payment for the time period from November 2 through 10, 2010, when SMI
applied its "standby/lay day charge," because "it did not work and could have worked."  Doc.

- The December 1, 2010 invoice for $21,970 (covering November 15 to 28, 2010) was paid on February 10, 2011, after SMI inquired four times about the status of the payment. Doc. No. 31-2 at 42-44, 46, 62-63, 74-75, 77; Doc. No. 36 at ¶¶ 94, 102.

- The December 13, 2010 invoice for $61,298 (covering November 29 to December 12, 2010) was paid only in part, and only after SMI inquired at least eight times about the status of the payment. Doc. No. 31-2 at 46-49, 62-63, 74-75, 77; Doc. No. 31-3 at 12-13, 20-21, 24; Doc. No. 36 at ¶¶ 95, 109, 112. KCC ultimately made five $10,000 payments, between June 10 and July 8, 2011. Doc. No. 31-3 at 35-36, 38-39, 41-42, 44-45, 47-48; Doc. No. 36 at ¶¶ 119-23.

- The December 30, 2010 invoice for $45,938.08 (covering December 13 to 26, 2010) was paid only in part, and only after SMI inquired at least seven times about the status of the payment. Doc. No. 31-2 at 53-56, 62-63, 74-75, 77; Doc. No. 31-3 at 12-13, 20-21; Doc. No. 36 at ¶¶ 97, 109, 112. KCC made a $10,000 payment toward this invoice on July 15, 2011. Doc. No. 31-3 at 50-51; Doc. No. 36 at ¶ 124.

- The January 10, 2011 invoice for $20,894 (covering December 27, 2010 to January 9, 2011) was paid only in part, and only after SMI inquired at least six times about the status of the payment. Doc. No. 31-2 at 58-60, 62-63, 74-75; Doc. No. 31-3 at 12-13, 20-21; Doc. No. 36 at ¶¶ 98, 109, 112. KCC made a $10,000 payment toward this invoice on June 7, 2010. Doc. No. 31-3 at 32-33; 36 at ¶ 118.

- The January 25, 2011 invoice for $22,050.36 (covering January 10 to 23, 2011) was paid

---

No. 46 at ¶ 92. KCC makes similar assertions with respect to six subsequent invoices, three of which KCC paid in full or in part, and all of which were paid long after the January 21st maneuver. See id. at ¶¶ 98-99, 101, 103-05. These contentions will be explored further below.

in full on May 11, 2011, after SMI inquired at least five times about the status of the

payment.  Doc. No. 31-2 at 65-68, 74-75; Doc. No. 31-3 at 12-13, 20-21, 24, 26-27; Doc.

No. 36 at ¶¶ 99, 109, 112, 116.

•       The February 7, 2011 invoice for $17,528 (covering January 24 to February 6, 2011) was

paid on June 1, 2011, after SMI inquired at least four times about the status of the

payment.  Doc. No. 31-2 at 77-79; Doc. No. 31-3 at 12-13, 20-21, 29-30; Doc. No. 36 at

¶¶ 101, 109, 112, 117.

•       The February 22, 2011 invoice for $54,690.40 (covering February 7 to 20, 2011) was

never paid, despite four inquiries by SMI about the status of the payment.  Doc. No. 31-3

at 2-3, 6-7, 12-13, 20-21; Doc. No. 36 at ¶¶ 103, 109, 112.

•       The March 11, 2011 invoice for $47,313.20 (covering February 21 to March 6, 2011)

constituted "the final invoice for the barge portion of the job."  Doc. No. 31-3 at 5, 8-10,

20-21, ; Doc. No. 36 at ¶ 104.  SMI inquired at least four times about the status of the

payment, which was never made.  Doc. No. 31-3 at 12-13; Doc. No. 36 at ¶ 109, 112.

•       The April 6, 2011 invoice for $6,680 (covering March 7 to April 2, 2011) was the final

invoice for the project.  Doc. No. 31-3 at 15-16; Doc. No. 36 at ¶ 110.  KCC never paid

it, despite two inquiries by SMI.  Doc. No. 31-3 at 20-21; Doc. No. 36 at ¶ 112.

The total of the unpaid invoices exceeds $166,000.

        E.      The Litigation

        SMI sued KCC in September 2011, alleging breach of the Charter, unjust enrichment,

and a violation of Chapter 93A of the Massachusetts General Laws.  Doc. No. 1.  SMI's claims

arise from KCC's failure to pay the amounts detailed above.  Id.  KCC answered and

counterclaimed, alleging breach of contract, breach of express and implied warranties, and entitlement to "back charges."[10]  Doc. No. 9.  According to KCC, SMI abrogated its obligations under the Charter by failing to provide vessels appropriate for the nature of the work and parameters of the project location, and this breach caused the project to last longer and require more equipment than it should have.  Id.; see Doc. No. 36 at ¶ 131.

The parties consented to the jurisdiction of the undersigned Magistrate Judge on February 6, 2012, Doc. No. 17, and after completing discovery, SMI moved for summary judgment, Doc. No. 27.  Although the motion appears to seek entry of judgment in SMI's favor as to all claims and counterclaims, see id. (seeking contract damages, multiple damages, attorney's fees, and costs), the brief is limited to the breach of contract claim and KCC's counterclaims, Doc. No. 28. The Court held a motion hearing on July 11, 2013, at which SMI's counsel confirmed the motion does not seek judgment with respect to SMI's unjust enrichment or Chapter 93A claims.[11]

---

[10]Initially, a notice of entry of default was entered as to KCC, Doc. No. 6, but it was vacated after KCC appeared in this action, Doc. No. 8.

[11]In any event, because the Court agrees SMI is entitled to judgment on its breach of contract claim, the unjust enrichment claim would be subject to dismissal.  See Watkins v. Omni Life Science, Inc., 692 F. Supp. 2d 170, 179 (D. Mass. 2010) (noting unjust enrichment is an "equitable stopgap for occasional inadequacies in contractual remedies at law," and requires a showing of an "absence of a remedy provided by law"); Robert E. Ricciardelli Carpet Serv., Inc. v. Home Depot U.S.A., Inc., 679 F. Supp. 2d 192, 211 (D. Mass. 2010) ("Where a contract governs the parties' relationship, a plaintiff by definition has an adequate remedy at law.").

Further, counsel agreed at the motion hearing that, should SMI prevail on its breach of contract claim and be awarded full contract damages, it would elect to abandon its Chapter 93A claim.  Should SMI wish to pursue such a claim, summary judgment would not be appropriate because further evidence would be necessary.  See Robert E. Ricciardelli, 679 F. Supp. 2d at 211 ("A mere breach of contract does not give rise to a Chapter 93A violation.  Chapter 93A reaches only those breach of contract cases that have an 'extortionate quality.'" (internal citations omitted)).

II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); accord Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995).  The Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation."  Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009).

"There must be sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50.  "Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact."  Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).  A material fact is one which has the "potential to affect the outcome of the suit under applicable law."  Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).  For a factual dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side."  Nat'l Amusements, Inc., 43 F.3d at 735 (internal citation

omitted).

III.     DISCUSSION

A.      SMI's Motion to Strike

As a preliminary matter, SMI has moved to strike portions of three affidavits submitted

by KCC in opposition to the motion for summary judgment.  Doc. No. 63.  The three affidavits,

executed by Conti, McQuaid, and Elsman, are nearly identical.  See Doc. Nos. 47-49.  SMI

challenges two aspects of the affidavits: 1) certain paragraphs that SMI characterizes as improper

expert or lay opinions; and 2) a paragraph that includes hearsay.  Doc. No. 63 at 2-3, 6.  KCC

has opposed the motion.  Doc. No. 65.

The Court discerns several problems with KCC's affidavits.  First, "[w]hen an interested

witness has given clear answers to unambiguous questions [in a deposition], he cannot create a

conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not

give a satisfactory explanation of why the testimony is changed."  Colantuoni v. Alfred Calcagni

& Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994); accord Cleveland v. Policy Mgmt. Sys. Corp., 526

U.S. 795, 806-07 (1999).  All three affiants were deposed.  Doc. Nos. 52-54.  Each was

represented by counsel, and two were questioned by their counsel as well as SMI's during the

course of their depositions.  Id.  To the extent their affidavits contradict their deposition

testimony, the Court will rely on their prior testimony.  For example, Conti's account of

negotiations with SMI leading up to the execution of the Charter is at odds with his deposition

testimony that he was not involved in that process.  Compare Doc. No. 47 at ¶ 10, with Doc. No.

52 at 18.  Similarly, Conti states in his affidavit that he "is very familiar with the use, operation,

capabilities and limitations of barges," Doc. No. 47 at ¶ 3, which conflicts with his testimony

14

that he did not know what type of barges were necessary for the project and that McQuaid was the person with "maritime experience," Doc. No. 52 at 20, 26-27.  In all such instances, the Court will disregard the affidavits (which do not acknowledge, let alone explain, the conflicts).

Second, the Court has little difficulty concluding that lay people are not equipped to opine on questions related to the safe operation of fifty-two-foot work barges on a navigable waterway such as the Delaware River, particularly during cold or stormy weather.  See Fed. R. Evid. 702; Dougherty v. Haaland, 457 F. Supp. 860, 866 (E.D. Pa. 1978) (finding expert testimony was required on question of safe operation of vessel, which requires "fairly specific knowledge" of matters "outside the common knowledge and experience of ordinary persons"), aff'd, 601 F.2d 574 (3d Cir. 1979), cert. denied, 444 U.S. 992 (1979).  KCC itself characterizes this issue as one requiring expertise.  See Doc. No. 45 at 13-14 ("Certainly, among the technical matters considered to be beyond the scope of ordinary experience and requiring expert testimony would be the water depths required to operate a particular vessel, with a particular load and in a particular arrangement."); Doc. No. 53 at 8 (McQuaid testified it was "common sense" that "professionals," i.e., boat captains, were needed to operate the barges).

KCC has not established that any of its affiants have the requisite "knowledge, skill, experience, training, or education" to offer opinions regarding subjects such as the proper mooring, operation, or navigation of SMI's barges.  See Doc. No. 52 at 20, 26-27, 54 (Conti did not know what type of barges were needed, or whether "at some point the river would be too low to operate th[e] barges"); Doc. No. 53 at 40 (McQuaid has recreational boating experience but does not hold any licenses or Coast Guard certifications, nor has he had formal training in the operation of commercial marine equipment); Doc. No. 54 at 16 (Elsman has experience doing

15

construction work "off of barges," but holds no licenses to operate them and has had no training
"in the operation of any types of vessels"). Accordingly, none of the affiants may offer expert
opinions in these areas, and the passages identified by SMI in its motion are stricken.[12]

Third, although lay witnesses may offer opinions in non-specialized areas based on their
own perceptions, Fed. R. Civ. P. 701, the depositions of Conti and Elsman reveal that any
opinions they could offer here would be based on McQuaid's perceptions, not their own. KCC
describes the relevant lay opinion testimony as being premised on the manner in which the
January 21st maneuver was performed, and a comparison of the river conditions on that date
with those present during the weeks preceding it. See Doc. No. 65 at 3-4. Neither Conti nor
Elsman was present for that event, and neither of them monitored the river conditions
consistently throughout the relevant time period. Doc. No. 47 at ¶¶ 27-28 (specifying that only
McQuaid was "on site" during the January 21st maneuver); Doc. No. 52 at 52 (stating Conti did
not personally track water depths); Doc. No. 54 at 21-24, 36 (stating Elsman did not speak with
anyone from SMI during January 2011, did not make personal observations regarding water
depth, and reviewed online water gauges for only two weeks of the relevant time period). As
such, neither Conti nor Elsman can offer admissible lay opinion testimony regarding the January

---

[12]Specifically, the Court will disregard the following language quoted in SMI's motion:
in the first excerpt, "negligently" and "negligently failed to provide enough free spool for the
spuds to stay engaged with the river bed"; in the second, "reasonable," "easily," and "simple,
reasonable, commonplace"; in the third, "negligently failed to navigate its vessel" and "negligent
navigational failure on the part of SMI"; in the fourth, "simple, reasonable, commonplace"; in
the fifth, "simple" and "in a reasonably diligent, skillful, workmanlike, and adequate manner"; in
the sixth, "failure to attend to its duties in a reasonably diligent, skillful, workmanlike, and
adequate manner," "simple commonplace and effective," and "reasonably available"; in the
seventh, "in a reasonably diligent, skillful, workmanlike, and adequate manner"; in the eighth,
"simple and successful"; and in the ninth, "reasonable," "to reasonably operate its vessel by
failing to," and "simple." Doc. No. 63 at ¶ 4.

21st maneuver and whether it would have been possible at an earlier date.  See Fed. R. Civ. P.

701(a).  To the extent McQuaid offers a lay opinion on this subject, the Court will consider his

affidavit and address it further below.

Finally, the affidavits contain inadmissible hearsay.  SMI provides one example present

in all three affidavits – a statement that Trumbull "similarly expressed frustration that SMI had

not employed [the January 21st] maneuver sooner."  Doc. No. 47 at ¶ 28; Doc. No. 48 at ¶ 32;

Doc. No. 49 at ¶ 34.  That statement is stricken, especially since a Trumbull representative was

deposed and portions of his deposition transcript are in the record.  Doc. No. 37.  In addition,

statements by each affiant regarding events he did not witness or information he learned from

one of the other affiants are likewise stricken.  See, e.g., Doc. No. 47 at ¶¶ 11-12 (describing

contract negotiations by KCC representatives other than Conti); Doc. No. 48 at ¶¶ 43-47

(describing letters written to Trumbull by Elsman, not McQuaid); Doc. No. 49 at ¶¶ 13, 34

(describing discussions between SMI representatives and McQuaid, not Elsman).

Accordingly, SMI's motion to strike is ALLOWED with respect to portions of the

affidavits which: 1) contradict the same witness's deposition testimony; 2) constitute expert

opinions; 3) convey lay opinions by Elsman and Conti; and 4) contain inadmissible hearsay.  It is

otherwise DENIED.

B.    The Charter and Its Interpretation

SMI characterizes the contract at issue here as a "time charter party," which is a maritime

contract.  Doc. No. 28 at 15-16.  Throughout its responses to SMI's statement of facts, KCC

denies that the contract was a "time charter," e.g., Doc. No. 46 at ¶ 14, and in its brief, KCC

treats the contract as a run-of-the-mill subcontract to perform work or provide services, see, e.g.,

Doc. No. 45 at 15-16.  To adopt KCC's view would require the Court to ignore the language of the Charter itself, the deposition testimony of KCC's own representatives, and the law related to such contracts.

The contract here is entitled "Time Charter Party," and it incorporates a sheet of terms entitled "Time Charter Party Terms."  Doc. No. 28-1 at 2, 7.  It refers to SMI as the "Owner/Operator" of a vessel and designates KCC the "Charterer."  Id. at 2.  It is "governed by and construed in accordance with" general maritime law.  Id. at 4.  Moreover, each of KCC's witnesses who was deposed on this subject demonstrated an understanding that the contract here was distinct from the sort of subcontracts they more commonly encountered.  See Doc. No. 52 at 40 (Conti explained "this was a lease – it was a little different [from our subcontract agreement]"); Doc. No. 54 at 11, 18 (Elsman was aware that barges and boats were chartered, and said a charter is more "like a purchase order"); cf. Doc. No. 53 at 18-19 (McQuaid did not negotiate or review the contract and did not know what a time charter was).

These circumstances are consistent with relevant legal principles, which confirm that the Charter is a maritime contract.  "A 'charter party' is 'a specialized form of contract for the hire of an entire ship . . . .'  A 'time charter party,' one of several different types of charter parties, is a contract 'to use a ship in order to ship goods for a specific period of time.'"  Navieros Inter-Americanos, S.A. v. M/V Vasilia Exp., 120 F.3d 304, 308 n.1 (1st Cir. 1997) (quoting 2 Schoenbaum, Admiralty & Maritime Law § 11-1 and § 11-5) (internal citations omitted).  Pursuant to such a contract, the ship owner makes his vessel available to the charterer for a specified purpose and amount of time, with the charterer bearing expenses including "hire" paid based on the amount of time the vessel is under charter.  See id.  That is precisely what was

contemplated here.

Interpretation of a maritime contract is a legal matter which turns on general principles of contract law.  See Jimenez v. Peninsular & Oriental Steam Nav. Co., 974 F.2d 221, 223 (1st Cir. 1992) (applying "general rules of contract interpretation" to maritime contract).  The First Circuit recently summarized those principles as follows:

> Absent an ambiguity, the court interprets a contract according to its plain terms, in a manner that gives reasonable effect to each of its provisions.  A contract is not ambiguous simply because litigants disagree about its proper interpretation. Ambiguity arises only if the language is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.

Weiss v. DHL Express, Inc., Nos. 12-1853, 12-1864, 2013 WL 2382591, at *4-5 (1st Cir. June 3, 2013) (internal quotations and citations omitted).  Furthermore, a time charter is "construed with reference to the intention of the parties at the time it was made, irrespective of the events which may afterwards occur."  Lowber v. Bangs, 69 U.S. 728, 740 (1864).  The parties' intentions may be demonstrated via extrinsic evidence only if the language of the contract is ambiguous.  See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 130 S. Ct. 1758, 1769 n.6 (2010).

Like other contracts, time charters impose obligations of good faith and fair dealing on the parties in the course of their performance and enforcement.  See Overseas Phila., LLC v. World Council of Credit Unions, Inc., 892 F. Supp. 2d 182, 189 (D.D.C. 2012).  KCC has not, however, cited any case incorporating an implied warranty of workmanlike service into a time charter, and the Court is aware of none.  See Doc. No. 45 at 15-16 (citing cases involving contracts to perform ship repairs, promote real estate sales, and build a house).  As SMI aptly

19

suggests, a time charter is more like a lease of a vehicle[13] than a service contract and, thus, is not

the sort of agreement into which an implied warranty of workmanlike service logically can be

read.[14]  As such, KCC's second counterclaim (i.e., "breach of express and implied warranties")

fails to the extent it turns on an implied warranty of workmanlike service.

    With these principles of maritime contract construction in mind, the Court turns to the

parties' breach of contract claims.

    C.      Breach of the Charter

    Each party claims the other breached the Charter.  SMI's claim rests on KCC's failure to

pay various invoices.  KCC's is based on its assertions that SMI claimed it could not operate due

to weather or water levels at times when it actually could have operated, and that SMI failed to

act in good faith by not suggesting alternative methods of performing work when weather

conditions did preclude use of the barges.  After careful consideration, and in light of the plain

language of the Charter, the Court agrees with SMI.

---

[13]Or, as Elsman characterized it, the Charter was more like a purchase order than a
subcontract for work or services.  Doc. No. 54 at 18.

[14]At the motion hearing, KCC's counsel argued Parks v. United States, 784 F.2d 20 (1st
Cir. 1986), supported the notion that maritime contracts include an implied warranty of
workmanlike service.  Parks, however, concerns indemnification issues not present here and
does not address the distinct category of time charters.  See id. at 25-27.
    Moreover, KCC's counterclaim based on this implied warranty is explicitly grounded in
its assertions that SMI failed "to adjust its barges to facilitate work in the prevailing river
conditions," and "to advise [KCC] of the availability of alternative vessels that would similarly
work in low water."  Doc. No. 45 at 15.  Even if the Court were to conclude that the Charter
incorporated an implied warranty of performance in a workmanlike manner, such a warranty in
this contract logically would guarantee only that SMI's captains would safely and reasonably
skillfully operate the barges KCC chartered.  It would not require SMI to modify the barges or
suggest alternative vessels, as KCC suggests.  Although those obligations might arise in a
services contract to provide necessary maritime support for the bridge remediation, KCC did not
obtain that agreement here.

KCC's theory fails for three primary reasons. First, KCC misunderstands SMI's burden of proof. According to KCC, SMI cannot meet its burden of proving it performed its duties under the Charter by "simply baldly opin[ing] that it was prevented from working by weather and river conditions." Doc. No. 45 at 14-15. However, that is precisely what the Charter stated – i.e., that SMI was authorized to unilaterally determine when it could and could not safely operate the barges – and it is consistent with general maritime law. See Gilmore & Black, The Law of Admiralty 204 (2d ed. 1975) (discussing a vessel master's expertise in judging whether operation under certain conditions is safe, based on his experience in navigation and with the vessel's specific characteristics). The unambiguous terms of the Charter granted SMI (and the masters of its vessels) "exclusive control and command" over the operation of the barges, including "the exclusive right . . . to determine whether operation . . . may be safely undertaken." Doc. No. 28-1 at 2. Nowhere in its briefing does KCC confront this critical clause, which explicitly designated SMI (and its masters) as the sole arbiters of whether it was safe to operate the barges at any given time. SMI was not then, nor is it now, required to consult any experts beyond its own licensed captains before determining whether operation of the barges was safe. Moreover, KCC did not then, nor has it now, consulted any licensed captain or other expert of its own to call into question the reasonableness of SMI's determinations.[15] See Doc. No. 53 at 29.

---

[15]With respect to each "lay day" charged by SMI as a result of its own determinations that water or weather conditions rendered operation of the barges unsafe, KCC agrees that SMI contemporaneously cited such conditions as its reasons for not operating, and that various weather events did occur coinciding with those determinations. See, e.g., Doc. Nos. 36 & 46 at ¶¶ 22-24 (admitting it rained and the river rose on October 1, 2010); id. at ¶ 83 (admitting the barges were stuck in ice on January 24, 2011); Doc. No. 48 at ¶¶ 22, 26 (admitting SMI stated "river depths were too low to operate its vessels" between November 2 and 10, 2010 and between December 28, 2010 and January 21, 2011).

Under these circumstances, the Court may not "rewrite the contract to take away [SMI's]

discretion and empower the jury to decide whether" the barges could have been operated safely

during the relevant time periods.[16]  Weiss, 2013 WL 2382591, at *6.

Second, KCC exaggerates the scope of SMI's contractual obligations by suggesting SMI

was required to "advise [KCC] that alternative vessels were available that could have operated in

low water, thereby minimizing delays," Doc. No. 45 at 19, or to make an "hour-by-hour"

determination that "river depths and conditions prevented it from working for each and every

day that it claims," id. at 13.  The Charter required no such things.  It simply required SMI to

deliver the designated vessels at a designated time in a designated location, and to operate those

vessels according to KCC's direction, subject to the limitations contained in the Charter.  See

Navieros, 120 F.3d at 308 n.1 (quoting 2 Schoenbaum at § 11-5 and its definition of a "time

charter party"); see generally Doc. No. 28-1 at 2-4, 7, 9.  The section of the Charter setting forth

applicable "standby/lay *day*" charges does so on a "daily" basis, or by "shift."  Doc. No. 28-1 at

7, 9 (emphasis added).  The Charter contains no provisions obligating SMI to recommend the use

of vessels beyond those chartered, or to reassess weather conditions on an hourly basis

throughout "day(s) the equipment is unable to operate due to poor weather conditions or river

freezing."  Id.

Third, the crux of KCC's argument (and the lay opinion McQuaid offers in his affidavit)

---

[16]There is a serious question whether, even if KCC had offered a conflicting expert
opinion regarding SMI's ability to move the barges safely, the language of the Charter would
nonetheless place the decision exclusively within SMI's discretion, subject only to the covenant
of good faith and fair dealing.  See Weiss, 2013 WL 2382591, at *6 ("A party may breach the
covenant without breaching any express term of the contract.").  Here, KCC has offered nothing
but speculation to support its assertion that SMI made its decisions regarding operation of the
barges in bad faith.  See note 18, infra.

is that the "success" of the January 21st maneuver is proof that SMI could have operated the barges safely in that manner throughout previous low-water periods, as "river conditions had not meaningfully varied" during those periods.[17]  See Doc. No. 45 at 2; Doc. No. 48 at ¶ 34; Doc. No. 65 at 3.  However, McQuaid – the only KCC representative who was present for the maneuver – admitted during his deposition that the barge SMI moved on January 21, 2011 hit the bottom of the river during the maneuver.  Doc. No. 53 at 53-54, 59.  McQuaid further testified the barges had not been moved before January 21st because SMI's captains had expressed a concern that doing so would result in the barges touching the river bottom, id. at 59, which is precisely what McQuaid admits happened during the January 21st maneuver.

By its terms, the Charter restricted the work area within which KCC was permitted to use the barges to places "where the [barges] can safely lie *always afloat*."  Doc. No. 28-1 at 2 (emphasis added).  Thus, SMI was not obligated to operate the barges during times or in places where the water was too shallow for the barges to travel without touching bottom, as doing so might endanger either the vessels or the people on them.  So although SMI "succeeded" in relocating the barge to a deeper part of the river on January 21st, it is undisputed that such "success" was accomplished only with the barge hitting the rocky river bottom along the way.  In other words, even drawing all reasonable inferences in KCC's favor, the maneuver is not evidence that SMI breached the Charter by placing the barges on standby during the relevant low-water periods; rather, it supports SMI's captains' judgment regarding the low-water

---

[17]Although for present purposes the Court will accept KCC's claim that water levels did not "meaningfully vary" during the relevant low-water periods, that claim undermines KCC's assertion in other sections of its brief that "river conditions and elevations changed on an hourly basis, or more often."  Doc. No. 45 at 13.

conditions and their inability to move the barges while keeping them "afloat" in such conditions. In fact, the January 21st maneuver is evidence SMI went beyond the scope of its contractual obligations by attempting to move the barge in low-water conditions in response to KCC's "regular[] inquir[ies]" about moving the project along.  See Doc. No. 48 at ¶ 27.

KCC does not dispute that it refused to pay SMI's invoices in full.  Because KCC's only justification for not doing so is its meritless assertion that SMI breached the Charter, SMI is entitled to judgment on its breach of contract claim, as well as KCC's counterclaims for breach of contract and back charges.[18]  Therefore, consistent with the Charter's terms, SMI is entitled to full payment of all outstanding invoices, attorneys' fees and costs, and interest.  See Doc. No. 28-1 at 3.

The only issue remaining with respect to the contract claims is whether the interest rate specified in the Charter – "1.5% after 30 days (18% APR)," id. at 9 – "amounts to impermissible punitive liquidated damages and is unenforceable," Doc. No. 45 at 20.  Under general maritime law, prejudgment interest "should be granted absent peculiar circumstances."  Joseph v. J.P. Yachts, LLC, 436 F. Supp. 2d 254, 273-74 (D. Mass. 2006) (internal quotations omitted).

---

[18]KCC's failure to pay SMI as required by the Charter began early in the project, with late payments of every invoice beginning in November 2010.  Although SMI would have been well within its contractual rights to withdraw the barges or suspend performance based on KCC's failure to make timely payments, see Doc. No. 28-1 at 3, SMI continued to operate the barges and work boats when its masters determined they could do so safely.  Such conduct is evidence that SMI took seriously its implied duty to act in good faith.  This, combined with KCC's failure to offer anything beyond mere speculation that SMI's decisions regarding when it could not safely operate the barges were undertaken in bad faith, is fatal to KCC's second counterclaim.  Compare Doc. No. 45 at 19 (speculating that SMI's claims that conditions were not suitable for safe operation were "pretext aimed at extending the contract, getting paid without working and maximizing the amount of money paid to it"), with Doc. No. 28-1 at 9 (providing SMI was paid $2,400 per barge per shift and $700 per work boat per shift on days when it worked, and only $450 per barge per shift on days when it determined work was unsafe).

Prejudgment interest is determined based on the law "in the state where the court is located." Id. at 274.  In Massachusetts, the relevant statute provides for interest to be added to damages in contract actions "at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand."  Mass. Gen. Laws ch. 231, § 6C.  Here, the Charter establishes an interest rate, and that rate has been applied by courts in this jurisdiction where contracts between corporate parties so specified.  See, e.g., Global NAPs, Inc. v. Verizon New England Inc., 603 F.3d 71, 92-93 (1st Cir. 2010) (awarding interest at 18% contract rate).  Accordingly, the Court sees no reason not to apply it here.

IV.    CONCLUSION

For the foregoing reasons, SMI is entitled to judgment as a matter of law on its breach of contract claim, and KCC's counterclaims fail.  SMI's motion is ALLOWED.

Under the language of the Charter, SMI is entitled to the following contract damages: the amount of the unpaid invoices; interest on that amount at a rate of 18%, calculated from the original due date of the payments through the date payment is made; and attorney's fees and costs.  Doc. No. 28-1 at 3.  The Court is not in a position to calculate the contract damages on the record before it.  Accordingly, within thirty days of this Memorandum and Order, SMI shall submit a petition detailing the amounts owed in each category of contract damages, explaining its interest calculations, and providing support for its fees and costs.[19]  Within fourteen days of

_____

[19]Counsel are reminded of their obligation pursuant to Local Rule 7.1(A)(2) to confer and attempt in good faith to resolve or narrow the issues presented to the Court.  This obligation applies to SMI's petition regarding contract damages and, to the extent the parties can agree upon the amounts at issue, they should do so.

In the event that SMI does not wish to abandon its Chapter 93A claim in light of the Court's ruling, it must notify the Court of its intent to pursue the claim within seven days of this Order so that an initial pretrial conference may be scheduled.

SMI's submission, KCC shall file any objections thereto.  Within seven days of receiving KCC's objections, SMI may file a reply limited to five pages in length.

SO ORDERED.

　　　　　　　　　　　　　　　　　　　_ /s/ Leo T. Sorokin 　　　　　　　　　　
　　　　　　　　　　　　　　　　　　　Leo T. Sorokin
　　　　　　　　　　　　　　　　　　　Chief U.S. Magistrate Judge